**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMR M. AMR, MURRAY AVENT, TOM AVENT, PETER AYREY, JOHN BARATTA, JOHN BARATTA, IRA, DONNA BARATTA, IRA, JOHN BARATTA, CUSTODIAN FOR ALEXANDRA BARATTA, DONALD BARNETT, PATRICK BIGG, GEORGE BOCK, PAUL BOTTA, BARRY CARDINER, ROD COMER, GRAHAM DEFRIES, JAMES DONOHUE, DINA M. DROVETTO, MARTIN FINDLAY, PATRICK FITZGERALD, COLIN GARDNER, ROB GRATON, JOHN HALLE, SLOE HARDIN, JEFF HOOVER, JON ISAKSSON, DANIEL KRUEGER, MICHAEL KUSHNER, CAROLINE KUSHNER, ALAN LEVINE, QUINFANG LI, FRANK W. LIN, KANG LIU, MICHAEL MAYER, BARBARA MAYER, CHARLES McGOWAN, GENE MONACO, GEORGE F. MORGANTHALER, CHRIS MULROONEY, JONATHAN NELSON, KEITH NICHOLSON, UDO NIEHAGE, AZAD OOTAM, MICHAEL PIATT, JAMES PRICE, FRANK PRIETO, INGO RAFF, STEVEN RATHJEN, TROY REISNER, DONALD RICHARDS, TORSTEIN ROBSTAD, DEBRA ROSS, RAYMOND SHARP, ALAN SHELDON, MARC SKALETSKY, KATHLEEN W. SMITH, DOMINICK STALLONE, DAVID THOMPSON, JOSEPH VIRZI, STEVEN WAITEKAITIS, JOHN WEISEL, KEVIN WILSON, GERD WITTKEMPER and RENJIE YUAN,<br><br>    Plaintiffs,<br><br>  v.<br><br>VINCENT F. SOLLITTO, JR., JAMES CHING HUA LI, MAN KIT (THOMAS) CHOW, JOHN S. HODGSON, CHRISTOPHER C.L. LIU, FTI | Civil Action No.: 10-CV-5194<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND COMMON LAW**<br><br>**JURY TRIAL DEMANDED** |



CONSULTING, INC., GREG RAYBURN,
MICHAEL GARNREITER, YASUSHI
CHIKAGAMI, SHIH-JYE CHENG, MAX
FANG, DAVID CHAVOUSTIE, BRUCE
BERKOFF, MICHAEL J. MILLER and
SILVER POINT FINANCE, LLC,

Defendants.

Plaintiffs Amr M. Amr, Murray Avent, Tom Avent, Peter Ayrey, John Baratta, John Baratta, Ira, Donna Baratta, Ira, John Baratta, Custodian For Alexandra Baratta, Donald Barnett, Patrick Bigg, George Bock, Paul Botta, Barry Cardiner, Rod Comer, Graham Defries, James Donohue, Dina M. Drovetto, Martin Findlay, Patrick Fitzgerald, Colin Gardner, Rob Graton, John Halle, Sloe Hardin, Jeff Hoover, Jon Isaksson, Daniel Krueger, Michael Kushner, Caroline Kushner, Alan Levine, Quinfang Li, Frank W. Lin, Kang Liu, Michael Mayer, Barbara Mayer, Charles McGowan, Gene Monaco, George F. Morganthaler, Chris Mulrooney, Jonathan Nelson, Keith Nicholson, Udo Niehage, Azad Ootam, Michael Piatt, James Price, Frank Prieto, Ingo Raff, Steven Rathjen, Troy Reisner, Donald Richards, Torstein Robstad, Debra Ross, Raymond Sharp, Alan Sheldon, Marc Skaletsky, Kathleen W. Smith, Dominick Stallone, David Thompson, Joseph Virzi, Steven Waitekaitis, John Weisel, Kevin Wilson, Gerd Wittkemper and Renjie Yuan (collectively, "Plaintiffs"), by and through their counsel, hereby file this complaint, against Vincent F. Sollitto, Jr., James Ching Hua Li, Man Kit (Thomas) Chow, John S. Hodgson, Christopher C. L. Liu, FTI Consulting, Inc., Greg Rayburn, Michael Garnreiter, Yasushi Chikagami, Shih-Jye Cheng, Max Fang, David Chavoustie, Bruce Berkoff, Michael J. Miller and Silver Point Finance, LLC, (collectively "Defendants"), including former officers and directors of Syntax-Brillian Corp. ("SBC" or the "Company") and, in support thereof, allege upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia,* the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the public documents and announcements made by defendants, Securities and Exchange Commission ("SEC") filings, and press releases and testimony under oath during the bankruptcy proceedings in the United States Bankruptcy Court for the District of Delaware regarding SBC as follows:

## JURISDICTION AND VENUE

1.     The claims asserted herein arise pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j (b) and 78t (a) and the

rules and regulations promulgated thereunder by the SEC, including Rule 10b-5, 17 C.F.R. §240.10b-5 and the common law.

2.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

3.      Venue is proper in this District pursuant to Section 27 of the Exchange Act as FTI and Silver Point maintains business operations in this District.

4.      In connection with the acts, transactions and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of the national securities exchanges.

## PARTIES

A.      **Plaintiffs**

5.      Plaintiffs purchased SBC common stock[1] on various dates from November 15, 2007 through SBC's filing for Chapter 11 bankruptcy on July 8, 2008 (the "Relevant Purchase Period") and/or refrained from the sale thereof in reliance on public statements made by or on behalf of SBC and defendants, including press releases, corporate conference calls, and periodic reports filed by SBC with the SEC.

6.      Plaintiff Amr M. Amr bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

7.      Plaintiff Murray Avent bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

8.      Plaintiff Tom Avent, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

9.      Plaintiff Peter Ayrey, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

---

[1]      At all relevant times until its delisting on July 22, 2008, SBC common stock traded under the ticker symbol "BRLC".

10.     Plaintiff John Baratta, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

11.     Plaintiff John Baratta, IRA, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

12.     Plaintiff Donna Baratta, IRA, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

13.     Plaintiff John Baratta, Custodian for Alexandra Baratta, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

14.     Plaintiff Donald Barnett, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

15.     Plaintiff Patrick Bigg, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

16.     Plaintiff Georges Bock, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

17.     Plaintiff Paul Botta, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants

18.     Plaintiff Barry Cardiner, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

19.     Plaintiff Rod Comer, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

20.     Plaintiff Graham Defries, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

21.     Plaintiff James Donohue, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

22.     Plaintiff Dina M. Drovetto, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

23.    Plaintiff Martin Findlay, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

24.    Plaintiff Patrick Fitzgerald, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

25.    Plaintiff Colin Gardner, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

26.    Plaintiff Rob Graton, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants

27.    Plaintiff John Halle, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

28.    Plaintiff Sloe Hardin, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

29.    Plaintiff Jeff Hoover, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

30.    Plaintiff Jon Isaksson, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

31.    Plaintiff Daniel Krueger, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

32.    Plaintiff Michael Kushner, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

33.    Plaintiff Caroline Kushner, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

34.    Plaintiff Alan Levine, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

35.    Plaintiff Quinfang Li, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

36.    Plaintiff Frank W. Lin, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

37.    Plaintiff Kang Liu, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

38.    Plaintiff Michael Mayer, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

39.    Plaintiff Barbara Mayer, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

40.    Plaintiff Charles McGowan, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

41.    Plaintiff Gene Monaco, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

42.    Plaintiff George F. Morganthaler, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

43.    Plaintiff Chris Mulrooney, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

44.    Plaintiff Keith Nicholson, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

45.    Plaintiff Jonathan Nelson, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

46.    Plaintiff Udo Niehage bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

47.    Plaintiff Azad Ootam, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

48.    Plaintiff Michael Piatt, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

49.    Plaintiff James Price, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

50.    Plaintiff Frank Prieto, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

51.    Plaintiff Ingo Raff, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

52.    Plaintiff Steven Rathjen, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

53.    Plaintiff Troy Reisner, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

54.    Plaintiff Donald Richards, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

55.    Plaintiff Torstein Robstad, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

56.    Plaintiff Debra Lynn Ross, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

57.    Plaintiff Raymond Sharp, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

58.    Plaintiff Alan Sheldon, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

59.    Plaintiff Marc Skaletsky, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

60.    Plaintiff Kathleen W. Smith, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

61.    Plaintiff Dominick Stallone, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

62.    Plaintiff David Thompson, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

63.    Plaintiff Joseph Virzi, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by defendants.

64.    Plaintiff Steven Waitekaitis, for himself and for the benefit of Plaintiff Treslax Construction Co., Inc. bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by Defendants.

65.    Plaintiff John Weisel, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by Defendants.

66.    Plaintiff Kevin Wilson, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by Defendants.

67.    Plaintiff Gerd Wittkemper, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by Defendants.

68.    Plaintiff Renjie Yuan, bought shares of SBC during the Relevant Purchase Period and suffered loss and damage as more fully set forth herein caused by Defendants.

B.    **Defendants**

69.    **Defendant James Ching Hua Li** ("Li") was appointed Chief Executive Officer effective October 2007 in replacement of Defendant Sollitto, and has been a director of SBC since December 2005 when he assumed the positions of President and Chief Operating Officer of SBC until June 2008.

70.    **Defendant Man Kit (Thomas) Chow** ("Chow") was the Company's Executive Vice-President and Chief Procurement Officer.  He served as Chief Procurement Officer and a director of the Company since November 2005 until June 2008.

71.    **Defendant Greg Rayburn** ("Rayburn") joined the Company as Interim Chief Operating Officer on March 23, 2008 as part of FTI Consulting, Inc.'s interim management of SBC, which began January 2008.  He was formally appointed Interim Chief Operating Officer by the Board on April 10, 2008 and later was made CEO, a position he occupied through the date of

the Company's bankruptcy. At the time he joined SBC, Rayburn was a Senior Managing Director and Practice Leader of FTI Palladium Partners, the interim management practice of FTI Consulting, Inc.

72.    **Defendant Bruce Berkoff** ("Berkoff") was a director of SBC during the relevant time period. He served on the Company's Nominating and Corporate Governance Committee.

73.    **Defendant David Chavoustie** ("Chavoustie") was a director of SBC during the relevant time period. He served on the Company's Nominating and Corporate Governance Committee and the Audit Committee.

74.    **Defendant Shih-Jye Cheng** ("Cheng") was a director of SBC during the relevant time period.

75.    **Defendant Yasushi Chikagami** ("Chikagami") was a director of SBC during the relevant time period. Defendant Chikagami also served on the Company's Nominating and Corporate Governance Committee

76.    **Defendant Max Fang** ("Fang") was a director of SBC during the relevant time period. He also served on the Company's Audit Committee.

77.    **Defendant Michael Garnreiter** ("Garnreiter") was a director of SBC during the relevant time period.

78.    **Defendant John S. Hodgson** ("Hodgson") served as the Chairman of the Audit Committee of SBC's Board of Directors from 2005 until September 2007 and as a director of SBC from November 2005 until his resignation on March 27, 2008. Hodgson additionally served as the Company's CFO, Executive Vice President and Treasurer from October 2007 until his resignation on March 24, 2008.

79.    **Defendant Christopher C.L. Liu** ("Liu") was a director of SBC at all relevant times.

80.    **Defendant Michael J. Miller** ("Miller") was a director of SBC during the relevant time period.

81.    **Defendant Vincent Sollitto, Jr.** ("Sollitto") was Chief Executive Officer from June 2003 through September 2007 and a director of the Company until June 2008.

82.    Defendants Sollitto, Li, Chow, Hodgson, Liu, Chikagami, Cheng, Fang, Chavoustie, Berkoff and Miller are hereinafter referred to collectively as the "Director Defendants".

83.    **Defendant Silver Point Finance, LLC** ("Silver Point") was a controlling person of SBC through its control of SBC's Debt which allowed it to assume and exercise management responsibilities during the relevant time period.

84.    At all relevant times, Defendant Silver Point retained the power to control the direction of SBC.

85.    From the time at which SBC defaulted on its loan on January 29, 2008, Defendant Silver Point exercised that authority to withhold funding to SBC without specific approval.

86.    Representatives from Defendant Silver Point participated by invitation in meetings of SBC's Nominations and Corporate Governance Committee as well as meetings of SBC's Audit Committee. For example, Silver Point attended meetings of both committees taking place on February 1, 2008.

87.    According to Defendant Rayburn and Nancy Mitchell, bankruptcy counsel for SBC, the Company would submit to Silver Point a list of requested disbursements, and Silver Point selected what payments to make. According to Rayburn:

> [A]t the point of time I became involved – they were approving a total amount that related to a list of disbursements – but [Silver Point] retained the ability to move that around but it was a total dollar request.

88.    According to Defendant Rayburn's sworn testimony at the August 18, 2008 bankruptcy hearing, at all times since Defendant Rayburn began working at SBC, Silver Point routinely approved all disbursements.

89.    **Defendant FTI Consulting, Inc.** ("FTI") was a consulting company which assumed management responsibilities at SBC as early as January 2008, when Defendant FTI

11

assumed the responsibilities of Chief Operating Officer. On March 23, 2008, FTI delegated those responsibilities to Defendant Rayburn.

90.    Defendant FTI continued to control the actions of SBC through its agent, Defendant Rayburn, who at all relevant times an employee of FTI.

91.    Defendant FTI attended meetings of SBC's Board of Directors by invitation.

92.    After calling the default on January 29, 2008, Silver Point and FTI demanded more frequent financial reporting from SBC. Pursuant to that end, Silver Point and FTI provided direct assistance SBC. According to FTI's agent, Defendant Rayburn, at that time, SBC "basically did quarterly financials. The lender had placed a lot of demands – rightfully so – in terms of information they needed to get. So there was a lot of assistance to try to generate that information."

93.    Defendants, by reason of their direct and substantial management and/or director positions and responsibilities during the time relevant of this Complaint, were "controlling persons" of SBC within the meaning of Section 20 of the Exchange Act and had the power and influence to control SBC and exercised such control to cause the Company to engage in the violations and unlawful practices complained of herein. Defendants, because of their positions had access to adverse non-public information about the true Company's financial condition and future prospects.

94.    The statements made or caused to be made by Defendants as alleged below were materially false and misleading when made. Defendants had no reasonable or adequate basis to justify or support the statements. The true financial and operating condition of SBC, which was known or recklessly disregarded by Defendants, remained concealed from Plaintiffs and the investing public. Defendants were under a duty to disclose those facts but instead misrepresented or concealed them during the relevant period herein.

### *Non-Parties*

95.    Non-party SBC has filed a voluntary Chapter 11 petition for bankruptcy. Accordingly, Section 362(a) of the Bankruptcy Code mandates that an automatic stay take effect.

But for Section 362(a) of the Bankruptcy Code, SBC would be named as a defendant in this action.

**SUBSTANTIVE ALLEGATIONS**

A.     **Overview of Defendants' Wrongful Conduct**

96.     During the relevant time period, Defendants issued false and misleading statements and/or caused SBC to issue such statements wherein it was expressly represented and/or implied that SBC had a viable business that could be restructured and operated as a going concern.

97.     Defendants knew that such implied and express representations were materially false and misleading because all Defendants knew no later than March 2008 that SBC could not be operated as a going concern in any form due to reasons not publicly disclosed and which Defendants actively concealed and/or aided and abetted the concealment thereof.

98.     Defendants knew but concealed from Plaintiffs that Silver Point and FTI had assumed operational responsibilities for SBC and had installed their own personnel within the Company to act as operating personnel with respect to the management of SBC.

99.     Defendants knew, as early as March 2008 that the directors and control persons of SBC, including Defendants FTI, Rayburn and Silver Point, were planning to liquidate SBC in a bankruptcy to attempt to salvage some value for Silver Point, the largest secured creditor.

100.     Defendants also knew but failed to disclose that SBC had no reliable accounting system to allow it to prepare reliable financial statements for public dissemination and that indeed SBC's systems did not even allow for the preparation of financial statements for internal use and that such failures precluded the operation of SBC as a going concern.

101.     Defendant Silver Point had received equity or equity equivalent securities as part of its extension of financing to SBC in October 2007, making Silver Point economically indifferent to SBC's stock price, and through actual or attempted transactions Silver Point tried to position itself to profit from a decline in the price of SBC stock.

102.    Before Silver Point announced that SBC, as of December 2007, was in default on the loan it had extended to SBC as recently as October 2007, Silver Point had attempted to register and to sell the common stock it was entitled to receive as part of the consideration for extending the financing to SBC while SBC's stock price was still trading at artificially inflated levels due to Defendants' failure to disclose the default. Silver Point thus positioned itself to profit from short selling of SBC stock.

103.    Defendants FTI and Rayburn were appointed by SBC at the direction of Silver Point, with whom Silver Point had had prior business relationships. Silver Point was confident that FTI and Rayburn would be aware of the interests of Silver Point as lender and the fact that Silver Point's interests as a lender conflicted with Plaintiffs' interests as SBC shareholders and purchasers of SBC stock.

**B.    As a Result of Its Insolvency, SBC Defaults on Its Credit Agreement With Defendant Silver Point**

104.    Upon information and belief, as a result of the conduct of certain executive officers and agents of SBC, including Defendants Li, Chow and Liu, SBC was insolvent from as early as October 1, 2007.

105.    Furthermore, upon information and belief, by October 2007 SBC was already defaulting on its significant Credit Agreement with Defendant Silver Point.

106.    In October 2007, as part of its financing agreement with SBC, Defendant Silver Point paid down a line of credit provided by Preferred Bank in the amount of $65,045,965.22.

107.    At a meeting of SBC's Board of Directors on December 15, 2007, the Board discussed the revenue covenant contained in SBC's financing agreement with Silver Point. Specifically, Defendant Hodgson reported that Silver Point indicated its willingness to modify the Company's present covenant to reflect the Company's new business plan. Upon hearing this news, Director Defendants instructed the Company's management to work diligently to secure the agreement to revise the covenant.

108.   On January 7, 2008, SBC owed an outstanding balance of $10.8 million on the $17.8 million loan from Preferred Bank.  On January 10, 2008, on behalf of SBC, Defendant Li signed an extension agreement that was backdated to December 21, 2007.  This extension agreement extended the deadline for payment on the line until May 5, 2008.

109.   On January 29, 2008, SBC officially went into default regarding its Credit Agreement with Defendant Silver Point.  By the time of SBC's bankruptcy filing, SBC owed $111,677,606 to Silver Point.

110.   As a direct result of its financial problems in January 2008, SBC retained Defendant FTI as financial consultant to provide restructuring advice.  FTI served as Chief Operating Officer for SBC until Defendant Rayburn assumed those responsibilities.

111.   On February 11, 2008, SBC's Board of Directors convened.  Michael Tucker, a managing director of FTI also attended the meeting.  At the meeting, the Director Defendants and FTI discussed Silver Point's credit facility, the delay in announcing the Company's second quarter results and holding an earnings call as well as the repurchase of LCD televisions sold to distributors in China.  Also at that meeting, the Director Defendants and FTI discussed proposals received from three investment banking firms regarding a potential PIPE transaction in which the Company would sell securities in a private placement.

112.   On February 14, 2008 the Company filed with the SEC a Current Report on Form 8-K announcing the second amendment of the Company's credit agreement with Defendant Silver Point (the "Second Amendment").  The Second Amendment contained (among other items) the following obligations to be performed by SBC:

> (a) Enter into an agreement with an Operational Advisor, which Operational Advisor will have oversight authority of the cash management of the Credit Parties (SBC and Silver Point) and work with [Silver Point] on various matters.
>
> (b) Provide [Silver Point] with a weekly Budget which budget must be approved by Operational Advisor.

The February 14, 2008 Form 8-K also disclosed that pursuant to the Second Amendment, Defendant Silver Point would have access to the customers and suppliers of the Credit Parties promptly upon request. Furthermore, SBC was obligated to provide to Silver Point certain projections which must then be reviewed by the Operational Advisor and determined to be consistent with the Budget.

113.    On February 21, 2008, SBC's Audit Committee met. Also present by invitation were Defendants Li, Hodgson, Miller, Berkoff, Liu as well as a representative from Defendant Silver Point. At the meeting, Defendant Hodgson reported that the Company was not able to file its Form 10-Q report with the SEC on a timely basis. Defendants also engaged in "extensive discussions" regarding Chinese accounts receivables, repatriation of funds then in China and accounting matters related to trading, among other issues.

114.    On February 22, 2008, SBC's Board of Directors met. Also present at the meeting by invitation were Defendants, Miller, Silver Point and FTI. At the meeting, these Defendants engaged in "a discussion of various matters relating to [Silver Point]" and appointed a Debt Committee, consisting of Defendants Berkoff, Chavoustie and Sollitto, to work with Defendant FTI and Greenberg Traurig on matters relating to Silver Point.

115.    On March 23, 2008, Defendant FTI brought in Defendant Rayburn to serve as Interim Chief Operating Officer.[2] According to Rayburn's testimony at an August 18, 2008 hearing in bankruptcy court, he was "brought in through FTI in a crisis management position."

116.    At a May 29, 2008 meeting, SBC's Board of Directors granted Defendant Li's request for leave from the position of CEO and formally appointed Defendant Rayburn as Interim CEO.

---

[2]    SBC's Board of Directors formally appointed Defendant Rayburn as COO of SBC on April 16, 2008.

117.    On June 4, 2008, SBC's Board of Directors appointed Defendant Rayburn as Interim CEO of SBC.

118.    On July 2, 2008, the Board of Directors terminated Defendant Li as President and CEO.

### C.    Defendants Caused Materially False and Misleading Statements to Be Made During the Relevant Period

119.    Throughout the Relevant Time Period, Defendants issued or caused the Company to issue numerous statements that were materially false and misleading to Plaintiffs. The statements contained herein were misleading because they failed to disclose that at all relevant times, SBC common stock was inflated and SBC itself was not inherently a viable business.

120.    On November 15, 2007, before the market opened, SBC filed its Form 10-Q for 1Q08. In the Form 10-Q, the Company revealed that, of the $123.2 million owed to the Company by SCHOT, $98 million was more that 120-days past due as of November 8, 2007. The Company also announced that revenues for the quarter were $150.6 million, a decline of 26.6% from the previous quarter, and that LCD television revenue from China in the first quarter of 2008 was $14.6 million, compared with $96.8 million in the prior quarter, a decline of approximately 85%.

121.    On November 28, 2007, conference call with analysts, Defendant Li stated:

> In China as you all are aware, our business model has changed. We have moved to a royalty collection model as opposed to our old model of direct unit sales. We believe this change has significant advantages for the Company.  It will allow us to improve cash flow and free up capital resources to address production constraints we have faced here in North America and other regions.
>
> We anticipate our shareholders will also benefit. Moving forward, we will provide clear financial reporting from China offering details on both units and royalty revenues in the region and a balance sheet with accounts receivable activity that is both more timely and significantly less burdensome on the operations of the Company.

Here is how our royalty agreement in China works. We have established a partnership with Olevia Far East/China. Olevia Far East is a totally independent entity separate from Syntax-Brillian operating in China. Olevia Far East is responsible for sourcing components and materials manufacturing, marketing and distributing LCD TVs in China. Olevia Far East will work with local OEM ODM partners to manufacturing Olevia branded TVs, HDTVs in China to Syntax-Brillian's strict specifications including components, design and performance.

Syntax-Brillian's product management team will ensure ongoing quality control of Olevia branded products. In return for the exclusive licensed rights to produce and distribute Olevia branded LCD HDTVs in China, Syntax-Brillian collects a 3% royalty on net sales of product in China by our exclusive partner. These royalty payments are paid quarterly and in advance based on projected net sales from Olevia Far East.

Olevia Far East has assumed the responsibility of SCHOT, South China House of Technology collections in China. SCHOT continues to act as a distributor of Olevia products into retail channels and will help to maintain our strong retail relationship in China. At this time, this royalty agreement applies only to China. We may evaluate opportunities to adopt this model in other regions if we think it is our advantage in the future.

As I stated, we believe this agreement and arrangement has several benefits. It will free up working capital and production capacity allowing us to concentrate our resources on the market opportunity in North America and other regions. We no longer commit money to high-volume LCD TV production coupled with long collection terms. It provides us a more accurate forecast of revenue as well as lower risk of capital. Also we can now allocate cash better to meet Olevia demand in regions globally.

****

As many people shared their concerns about the AR collection status from SCHOT, our exclusive distributor of the Olevia LCD HDTV products within the Greater China region since 2004. I must emphasize again that although we have done more than $400 million worth of business with this customer and they have been a good partner of ours for the last 3.5 years, there has not been a penny that we have written down or written off as a bad debt since we commenced the partnership.

In fact on March 31, 2007 this year, we had more than $190 million accounts receivable overdue for more than 160 days plus. But we were able to collect every penny of the account receivable by the end of June 30, 2007. From October 1 till now, we have been able to collect approximately $10 million of additional -- sorry $20 million additional payments from SCHOT which brings its AR balance down from approximately $123 million to approximately $92 million at the current date. We believe that in

time this amount of account receivable will also be fully paid up
just as it has been before.

122.    On December 2, 2007 Syntax-Brillian announced that it had completed sale of its LCoS™ Operations and furthered the deception that SBC could be operated as a going concern.

123.    On December 10, 2007, SBC filed a prospectus supplement with the SEC on behalf of itself and certain selling shareholders offering over 10 million of SBC shares. This prospectus revealed that shares were offered by Defendant Silver Point affiliates, Silver Point Capital, L.P. and its other affiliates, SPCP Group, L.L.C., SPCP Group III LLC, Durham Capital Corporation. Each selling shareholder offered to sell its entire holding in SBC in that offering.

124.    The prospectus noted that the Company incorporated by reference into the prospectus the Annual Report of Form 10-K for the year ended June 30, 2007, as filed on September 13, 2007; the Proxy Statement dated November 5, 2007, as filed November 5, 2007; the Supplement dated November 14, 2007 to the Proxy Statement, as filed on November 14, 2007; the Form 10-Q for the quarter ended September 30, 2007, filed with the SEC on November 14, 2007; and the Form 10-Q/A for the quarter ended September 30, 2007, filed with the SEC on November 15, 2007; the Current Report on Form 8-K as filed on July 25, 2007; Current Report on Form 8-K as filed on July 30, 2007; Current Report on Form 8-K as filed on August 29, 2007; Current Report on Form 8-K as filed on September 12, 2007; Current Report on Form 8-K as filed on September 28, 2007; Current Report on Form 8-K as filed on October 4, 2007; Current Report on Form 8-K as filed on October 23, 2007; Current Report on Form 8-K as filed on November 1, 2007; Current Report on Form 8-K as filed on December 3, 2007; and the description of common stock contained in the registration statement on Form 10 (Registration No. 000-50289), including any amendments or reports filed for the purpose of updating that description.

125.    Since at least December 24, 2007, Defendants knew that SBC has been in default on the Credit Agreement (as of SBC's bankruptcy petition date, SBC owed approximately $111,677,606 under the Credit Agreement, plus other amounts including interest).

126.    On February 11, 2008, SBC announced that it would require additional time to release its financial statements for the quarter ended December 31, 2007.  In a press release entitled "Syntax-Brillian Corporation Announces Delay of Fiscal Second Quarter 2008 Earnings and Provides Preliminary Fiscal Second Quarter 2008 Update and an Inventory Repurchase," Defendants caused the Company to state, in relevant part:

> Syntax-Brillian Corporation today announced that the company needs additional time to complete its financial statements for its second fiscal quarter ended December 31, 2007. *The company needs additional time in order to evaluate its accounting treatment related to its tooling deposits*. As a result, Syntax-Brillian will not release its fiscal second quarter 2008 results on February 11th, as previous anticipated. As this time, no date has been set for the second quarter release.

> **Preliminary Fiscal Second Quarter 2008 Update and an Inventory Repurchase**

> *The company recently received indications that due to a delay in the build out of the 2008 Beijing Olympic facilities, a large number of LCD TVs already sold through the company's distributors in China, had not been deployed. As a result, Syntax-Brillian initiated negotiations to repurchase the LCD TVs for redistribution primarily into the North America retail channel. The inventory repurchase reduces accounts receivable from our customers in China by $99 million bringing the remaining balance to approximately $63 million, of which $48 million is due from South China*
> *House of Technology ("SCHOT") and $15 million is due from Olevia Far East*.

> In the December quarter, total units shipped was approximately 252,000 which were shipped to North America and royalty revenue collected from China sales to Olevia Far East was approximately $3.2 million on until volume of approximately 390,000. The inventory repurchase was approximately 26,800 units.

127.    On February 27, 2008, SBC's treasurer communicated with a shareholder by email assuring them the Company was pursuing growth opportunities.

128.    On February 29, 2008, SBC announced the appointment of Michael Garnreiter to the Board as an independent non-executive Director effective February 28, 2008.  Mr. Garnreiter also served as the Audit Committee Chairman.

129.    On April 1, 2008, SBC announced that Defendant Li would reduce his base salary to $1 as a demonstration of his commitment to support the Company's "turnaround plan" that was allegedly in progress.  Defendant Li stated:

> "I am pleased to report that we are experiencing positive momentum from our national, regional and online retail partners, and that there has been a continued flow of orders.  To maintain the growth of the business, we are enhancing our supply chain operations and engineering our next generation of [televisions]."

130.    On April 3, 2008, SBC announced a new manufacturing agreement with Compal electronics.  The release included numerous positive assurances from Defendants Li and Liu:

> "This agreement with Compal takes our existing relationship to a vastly enhanced level," said James Li, President and Chief Executive Officer of Syntax-Brillian.  "It not only supports our supply chain management strategy for reducing costs and optimizing cash flow, but it is a key example of our determination to improve the overall efficiencies of Syntax-Brillian.

> "The alliance with Compal, combined with major existing alliances with Taiwan Kolin and Digimedia, further bolsters Syntax-Brillian's supply chain management continuity, engineering expertise, manufacturing proficiency, and financial strength in producing Olevia LCD HDTVs," said Christopher Liu, Chairman of Taiwan Kolin.

131.    On April 10, 2008, SBC announced in a press release that Defendant Rayburn had been appointed Interim Chief Operating Officer.  On behalf of SBC, Defendant Li stated that as part of the Company's "turnaround plan", Defendant Rayburn was to direct and oversee the worldwide operational infrastructure of SBC and report to Defendant Li:

> "Greg's extensive experience in enhancing value within companies and improving operations to realize growth potential will greatly benefit the company," said James Li, President and Chief Executive Officer, Syntax-Brillian Corporation.  "I look forward to working with him as we continue to focus on growing the business and realizing shareholder value."

132.    In an April 18, 2008 press release, SBC announced strategic initiatives to position the Company for future growth. The Company outlined "key actions" including: (1) "simplify supplier network"; (2) concentrate relationships with retail partners"; and (3) "workforce realignment". Defendant Li remarked: "[t]oday we are taking the actions that are necessary to move Syntax-Brillian into the next stage of its growth. By focusing on those customers that best match our brand attributes we can better position the Company for sustained controllable growth in the future."

133.    Also on April 18, 2008, SBC announced that investors should no longer rely upon the Company's financial statements for its fiscal year ended June 30, 2007, the interim periods contained therein, and the first fiscal quarter of 2008 based on an analysis of the accounting of the SCHOT "sales" and "tooling deposits."

134.    Further, on April 18, 2008, Defendant Chow resigned as Executive Vice President and Chief Procurement Officer of SBC. Defendant Chow continued to serve as a director of SBC.

135.    On May 8, 2008, a NASDAQ panel granted SBC's request for continued listing. In connection with an announcement of that event, Defendant Li, on behalf of SBC stated: "in addition to the NASDAQ matter, we are also focusing on the continuity of our business and continue to fulfill orders from retailers for our Olevia and Vivitar products in preparation for their fourth of July and back to school promotions… We anticipate continued demand as we plan the launch of new Olevia and Vivitar products which are currently in our development pipeline for availability later this year."

136.    Then, on June 5, 2008, Defendants announced that Defendant Li was taking an indefinite leave of absence, and that Defendant Rayburn would serve as SBC's Interim CEO,

effective June 4, 2008. The release also stated that Defendants Chow and Liu had resigned as directors at the end of May.

137. On June 11, 2008, just four weeks before SBC's bankruptcy filing, SBC announced new products to be introduced that summer, including its SRS TruSurround XT product. Defendant Miller stated: "We're happy to be working with an innovator like SRS Labs and look forward to developing our partnership further in the future." As revealed by Defendant Rayburn during his testimony during bankruptcy proceedings, these statements were made following Defendants' conclusion that the Company was no longer viable.

D.    **SBC Files for Chapter 11 Bankruptcy Protection and Defendant Rayburn Admits that At All Times During the Relevant Period, SBC Could Never Be Operated As a Going Concern**

138. On July 8, 2008 SBC announced an asset purchase agreement and filed a voluntary petition for Chapter 11 reorganization in United States Bankruptcy Court for the District of Delaware to facilitate the sale. *See Syntax-Brillian Corp., et al.*, No. 1:08-bk-11407 (D. Del. Jul. 8, 2008).

139. In a series of statements made during appearances in Bankruptcy Court, Defendant Rayburn and SBC, through counsel, admitted that not only did Defendant Rayburn join what was inherently a flawed business from the onset of his involvement, but that from as early as October 2007, SBC was in default of its Credit Agreement with Silver Point. Therefore, at all times during the Relevant Time Period, Defendants failed to provide Plaintiffs and shareholders with accurate information.

### SBC Was In Default As Early as October 2007

140. Defendants were aware that SBC's viability as a going concern was threatened as early as October 2007. According to the testimony of Nancy Mitchell, bankruptcy counsel for SBC, at an August 18, 2008 bankruptcy hearing:

> When I say that [SBC] was potentially in default as early as October, 2007, it didn't become clear until December that there was really a problem. But if you look at the loan documents, that default could relate back to October.
>
> And I was in the room when they made the decision to bring in additional help... I think that part of the issue was that when FTI came in at the end of January and then we got involved – the restructuring people at Greenberg got involved the week or so after that – what became clear was that this company had a lot more problems than what had initially been disclosed to us by the company when they brought in additional help.

141. Defendant Rayburn reiterated at SBC's August 20, 2008 sale hearing in bankruptcy court that January 29, 2008, the date at which Silver Point formally called a default, did not signal the Company's actual default date:

> I don't think the lender formally called an event of default until January 29th. The actual default itself, or series of defaults, could have occurred prior to that, could have occurred in December.

### Defendant Rayburn Recognized that SBC's Business Was Inherently Flawed

142. Rayburn also understood the severity of the problems associated with SBC's default. Rayburn testified at the August 18, 2008 hearing that at when he joined SBC, he was also aware that "[a]t the point in time that [SBC] went into default with the lender, which would have been January 29 [2008] ... they had zero working capital at that point. So it doesn't matter how much demand you have – you can't make a TV."

143. However, Defendant Rayburn also knew that it was not only SBC's fault that contributed to the capability of the Company to continue as a going concern. At a hearing on

24

July 9, 2008, Rayburn stated that from the moment he began working at SBC, he realized that

SBC's business model was fatally flawed:

> [SBC] had demand that it tried to meet, that it could never meet, it was never capitalized well enough, or structured correctly, to meet what I would say is very exorbitant demand for televisions, and they're quite good televisions. So, the issue has always been, you know, how do you keep the supply chain going and that takes money.

144. According to testimony at an August 18, 2008 bankruptcy hearing, Rayburn was

keenly aware of the severe problems at SBC from the day he began working:

> [M]y job from March 23 [2008] to the filing date was to try to figure out how to put out a fire of a burning business and see if we can save any kind of value in a business that ultimately was never a real business – never created a margin – absent price protection from Kolin, to be a successful business could not stand alone, period.

Moreover, SBC confirmed through its counsel that "something happened [at SBC] that's wrong,

I mean you know it, we know it, when [Rayburn] got there he knew it."

145. From the time he began in March, Rayburn was concerned about whether the

Company could make and sell its products profitably under SBC's royalty-based arrangement

with Kolin: "Those concerns existed when I came into the company in March, and those

concerns turned out to be well founded because absent the price protections from Kolin [the

televisions] could not be produced profitably so that's – I did not see any better course."

146. Rayburn admitted in his bankruptcy Court testimony that he was aware at all

times that SBC could not operate as a going concern:

> [W]hen I came into this company, which was March 23rd, you clearly did not have – this virtual organization was clearly not working anymore. The company itself wasn't – funds weren't flowing from Syntax back through to these entities in this sort of triangle.

147.    Rayburn emphasized that from the his first day at the Company, he was cognizant

of SBC's flaws:

> "seeing what I had on my hands in March, I had a business that,
> frankly, couldn't be profitable, could not generate positive cash
> flow, absent getting these price protection discounts that would
> come at the end of every quarter from Kolin, and they were part of
> an agreement, but there was no formula, okay. There was no set
> formula for those price protections. So when I'm sitting there with
> a business and I no longer have those quarter end price protections,
> the issue is, does the business work, and frankly it did not."

148.    At that same hearing, Rayburn emphasized that the Company's business model

was inherently flawed: "[t]he [C]ompany was dependent on the price protections from Kolin, so

again, I'll say it one more time. Without those, it was not viable."

149.    At the August 18, 2008 bankruptcy hearing, Rayburn admitted that by the end of

May 2008, he and Defendants had definitively concluded that SBC's business model was not

viable:

> We had by the end of May [2008] accomplished I think two or
> three things that led up to [Rayburn's appointment as Interim
> CEO] – *one was the conclusion that the business model was not
> viable* – there had been an extensive analysis done as to whether
> there was an option to go back and force – not force – but go back
> to the lender and say you should support a long term restructuring
> of the business in effect a long term turnaround of the business and
> we had to try to develop a view as to whether that would be
> feasible or not and by that point in time we had the view that it was
> not – so that was one of the bigger factors that led to the
> [leadership] change.

(emphasis added).

150.    Rayburn testified similarly during the August 20, 2008 sale hearing:

> And so during that March/April timeframe, my guess is that the
> Board felt more comfortable continuing and seeing if something
> would pan out in that regard, *and at the same time we were doing
> our analysis of the viability of the business, which ended up
> concluding in May that it was not viable*

(emphasis added).

151.    At the August 18, 2008 bankruptcy hearing, Rayburn admitted that as early as April 2008, he and other Defendants were aware that they would "be in a pitch battle with Kolin" for control of the Company.

152.    Moreover, at the August 18, 2008 hearing, counsel for SBC also mentioned that at all times the Company suffered from "continual problems with the financial statements".

153.    Defendant Rayburn testified on August 20, 2008 that "[u]ltimately, it came to a point where we felt it was necessary to actually pull the reliance on the prior financial statements, which we did."

## PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

154.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.    Defendants made false and misleading statements of material fact, and failed to disclose material facts during the relevant time period;

b.    the misstatements and omissions were material;

c.    the securities of the Company traded in efficient and open markets (excluding the effects of fraud), the Company was followed by analysts; and

d.    the misstatements and omissions alleged would tend to induce a reasonable investor to misjudge the value of SBC's securities.

155.    Plaintiffs purchased and retained SBC common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the omitted facts.

156.    Based upon the foregoing, Plaintiffs are entitled to a presumption of reliance upon the integrity of the market price for SBC's securities.

27

## NO SAFE HARBOR

157.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized, and/or approved by an executive officer of SBC who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act
### and SEC Rule 10b-5 Thereunder Against All Defendants

158.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

159.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

160.    Defendants directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiffs, and made various

deceptive and untrue statements of material facts and omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs. The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce Plaintiffs to purchase SBC common stock at artificially inflated prices.

161.   Defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, participated in the issuance of, the preparation and issuance of deceptive and materially false and misleading statements to the investing public as particularized above.

162.   As a result of the dissemination of the false and misleading statements set forth above, the market price of SBC common stock was artificially inflated.

163.   Plaintiffs relied, to their detriment, on the integrity of the market price of the stock in purchasing SBC common stock. Had Plaintiffs known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid.

164.   Plaintiffs have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

165.   By reason of the foregoing, Defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs in connection with their purchases of SBC common stock.

## COUNT II

### Violation of Section 20(a) of the Exchange Act Against All Defendants

166.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

167.    Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the Company's expansion plans and implementation thereof, Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

168.    In particular, Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

169.    By virtue of their positions as controlling persons, Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the wrongful conduct, Plaintiffs have suffered damages in connection with their purchases of the Company's securities.

## COUNT III

### Common Law Fraud, Misrepresentation and Deceit
### And Breach Of Fiduciary Duties Owed To Plaintiffs As Shareholders Of SBC

170.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

171.    Defendants made misrepresentations of fact and omissions of material fact to Plaintiffs concerning SBC's financial condition.  These misrepresentations and omissions were material to Plaintiffs' willingness to refrain from selling SBC common stock.  If Plaintiffs had known SBC's true financial condition, they would have sold SBC common stock before the precipitous drop in value.

172.    Defendants knew that their statements concerning SBC's financial affairs were false when made, Defendants intended Plaintiffs to rely on their statements, and Plaintiffs' reliance on Defendants' statements was reasonable.

173.    Defendants' conduct as alleged herein constitutes common law misrepresentation and fraud.

174.    As a result of Defendants' misrepresentations, omission, fraud and deceit, Plaintiffs are entitled to recover damages against Defendants, plus attorney's fees and costs.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf, pray for judgment as follows:

A.    Awarding compensatory damages in favor of Plaintiffs against Defendants for the damages sustained as a result of the wrongdoings of Defendants, together with interest thereon;

B.    Awarding Plaintiffs the fees and expenses incurred in this action, including reasonable allowance of fees for Plaintiffs' attorneys, and experts;

B.    Awarding Plaintiffs the fees and expenses incurred in this action, including reasonable allowance of fees for Plaintiffs' attorneys, and experts;

C.    Granting relief from the automatic stay under Section 362(d) of the United States Bankruptcy Code;

D.    Granting extraordinary equitable and/or injunctive relief as permitted by law, equity and federal and state statutory provisions sued on hereunder, including attaching, impounding, imposing a constructive trust upon or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that Plaintiffs have an effective remedy; and

E.    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues triable as of right by a jury.

Dated: February 1, 2011

SQUITIERI & FEARON, LLP

By:_____

Lee Squitieri
32 East 57th Street
12th Floor
New York, New York 10022
Tel:  212-421-6492
Fax: 212-421-6553

Mark C. Gardy
James S. Notis
Charles Germershausen
GARDY & NOTIS, LLP
560 Sylvan Avenue, Suite 3085
Englewood Cliffs, New Jersey 07632
Tel:  201-567-7377
Fax: 201-567-7337

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2011, a true and correct copy of the foregoing

**AMENDED COMPLAINT** was served via e-mail upon the counsel as set forth below:

Douglas Rappaport
Jacob J. Waldman
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 1, 2011.

Lee Squitieri